IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

WILLIAM BUCHANAN JACKSON,

        Plaintiff,

v.                              CIVIL ACTION NO. 2:20-cv-392

GREAT BRIDGE AUTO SALES CORPORATION,
t/a Wine Automotive,

**SERVE:**
Jeffrey Michael Wine, Registered Agent
8701 Marshfield Lane
Gloucester, Virginia   23061

        Defendant.

## **COMPLAINT**

Plaintiff WILLIAM BUCHANAN JACKSON ("Mr. Jackson"), by counsel, moves for judgment against the defendant, GREAT BRIDGE AUTO SALES CORPORATION, t/a Wine Automotive ("Wine Automotive"), on the grounds and in the amount as hereinafter set forth:

## **PARTIES**

1.      Mr. Jackson resides in Virginia Beach, Virginia.

2.      The defendant is a Virginia corporation, is registered to do business in Virginia, is engaged, *inter alia*, in the business of selling used vehicles to the public on a retail basis, and has its principal place of business in Chesapeake, Virginia.

3.      All acts of the defendant's agents and employees, as alleged in this Complaint, were performed within the course and scope of their agency and employment with the defendant and were authorized and/or ratified by the defendant.

4. The defendant was at all relevant times regularly engaged in the purchase and resale of motor vehicles, whether wholesale, at auctions, or to the retail public.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this action under the Motor Vehicle Information and Cost Savings Act ("Federal Odometer Act"), 49 U.S.C. § 32710(b); the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d); and the federal-question statute, 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state-law claims, which stem from the same transaction and events as the federal claims, under 28 U.S.C. § 1367(a).

6. Venue in the U.S. District Court for the Eastern District of Virginia's Norfolk Division is proper under 28 U.S.C. § 1391(b)(1) because the defendant's dealership and registered agent are located in this division, Mr. Jackson resides here and wishes to bring this action here, and thus the majority of witnesses expected to participate at trial either reside here or desire to litigate this action here.

## FACTUAL BACKGROUND

**A. While the parties negotiate a vehicle transaction, the defendant knowingly misrepresents the vehicle's condition, its odometer reading, and the warranty coverage.**

7. On February 14, 2019, the defendant purchased a 2015 Nissan Altima ("the vehicle"), bearing VIN number 1N4AL3AP1FN887960 and an odometer reading of 54,759 miles, from Sheehy Nissan of Manassas.

8. On February 28, 2019, National Tire and Battery in Chesapeake, Virginia, conducted a Virginia State Police safety inspection of the vehicle at the defendant's request. At that time, the vehicle's odometer reading had increased to 54,772 miles.

9. On May 1, 2019, the defendant took the vehicle, now bearing an increased odometer reading of 55,014 miles, to Banister Nissan of Chesapeake. The defendant reported "a knocking noise coming from the engine" and asked the service technician to "check and advise" about it. **Pl.'s Exhibit A**, Bannister Nissan Service Invoice. Bannister Nissan's invoice for this inspection and diagnosis shows that after inspecting the vehicle, the technician told the defendant that the vehicle needed a new engine and provided a quote for a replacement. *See id.*

10. Instead of fixing the problem, the defendant declined the technician's offer to replace the engine, paid the diagnostic fee, returned the vehicle to the defendant's lot, advertised the vehicle for sale, and tried to sell it to the defendant's customers.

11. In early July 2019, Mr. Jackson began shopping for a new car. To facilitate his purchase, he looked at online vehicle ads, including ads posted by the defendant. The defendant's ad for the vehicle, which the defendant said was in "very good condition," particularly drew Mr. Jackson's attention.

12. On July 8, 2019, Mr. Jackson, accompanied by his mother, Angela Buchanan, went to the defendant's lot to inspect and possibly buy the vehicle for his personal use.

13. The defendant has the words "Integrity, Value, Honesty, Commitment" posted on the front of its dealership office.

14. Mr. Jackson and Ms. Buchanan discussed the vehicle with the defendant's salesman, Andrew Wright, and its vice president of finance, Brian Korich. During negotiations, Mr. Wright advised that the vehicle was in "very good" or "excellent condition," but pointed out a very slight clicking or knocking noise coming from the front of the vehicle. Mr. Wright advised that this was "no big deal" and that it was likely caused by the vehicle's starter. Mr. Wright and Mr. Korich also offered to sell Mr. Jackson a third-party service contract—an ASC Warranty

3

Vehicle Protection Plan ("ASC Warranty")—that they both assured would cover any repair of the source of the noise.

15. The Buyer's Guide, which was part of the transaction paperwork, described to Mr. Jackson the defendant's written limited warranty. *See* **Pl.'s Exhibit B** at 1. In it, the defendant promised that the vehicle came with a six-month/6,000-mile 50/50 warranty.

16. A Virginia DMV Reassignment of Title by Virginia Motor Vehicle Dealer form ("Form VAD 20") was also part of the transaction paperwork. The Form VAD 20 included an Odometer Disclosure Statement in which the defendant certified that the vehicle's odometer reading and actual mileage, to the best of its knowledge, was 54,759 miles at the time of sale. *See* **Pl.'s Exhibit C.**

17. Another document that was part of the transaction, the ASC Warranty Service Agreement, listed the vehicle's odometer reading as 54,759 miles. *See* **Pl.'s Exhibit D** at 1.

18. Relying on the defendant's promises, including its misrepresentations and omissions about the vehicle, Mr. Jackson agreed to purchase the vehicle for $10,200.90, which included $442.25 in sales tax. He also purchased the ASC Warranty for $1,870 and was charged other miscellaneous fees and taxes. As part of the "agreement" to purchase the vehicle, Mr. Jackson traded in his 2005 BMW 3-Series for an allowance of $2,000 and paid a $500 down payment, thus financing the remaining $10,154. *See* **Pl.'s Exhibit E**, Retail Installment Sales Agreement ("RISC"), at 1–2.[1]

---

[1] The terms "agreement" and "contract," as used herein, are not synonymous and are used as those terms are separately defined in the Uniform Commercial Code. Va. Code Ann. § 8.1A-201(3), (12). Under Virginia Code § 8.1A-201(3), "agreement" means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade. Under § 8.1A-201(12), "contract" means the total legal obligation that results from the parties' agreement, as determined by the Uniform

19.     After accepting the offer, Mr. Jackson signed the RISC. In it, the defendant agreed to finance a portion of the purchase price. The defendant then sold and assigned the RISC to a third-party assignee, Towne Bank.

**B. Mr. Jackson discovers post-purchase that the vehicle has a serious engine defect and a hole in the floor, that the defendant knew this before the purchase but concealed the defects, and that the ASC Warranty will not cover the engine.**

20.     Within a week or two after purchase, the vehicle's noise worsened to a roar right after ignition, at idle, and while accelerating, indicating that it was coming from the engine. On or about September 4, 2019, the vehicle broke down, requiring Mr. Jackson to have it towed to Hall Nissan Virginia Beach to attempt to repair it. About a day later, a Hall Nissan service technician replaced a solenoid valve under the Nissan warranty, but the loud noise remained.

21.     On September 28, 2019, Mr. Jackson again took the vehicle to Hall Nissan to try to fix the loud engine noise. After inspecting the vehicle, a Hall Nissan service technician advised Mr. Jackson that the engine's cylinder block assembly, and thus the entire engine, needed to be replaced and that the replacement would cost $9,825.83. *See* **Pl.'s Exhibit F**, Hall Nissan Automobile Status Report, at 5–6. Hall Nissan refused to replace the engine under the Nissan warranty, however, because it concluded that the condition had existed before Mr. Jackson purchased the vehicle and stemmed from a previous owner's lack of maintenance and abuse.

22.     Upon learning that the engine would not be repaired under the Nissan warranty, Mr. Jackson submitted an engine-repair claim under the ASC Warranty, but the warranty representative denied the claim after concluding that the defective engine was a pre-existing

---

Commercial Code and as supplemented by any other applicable laws.

condition, contrary to the defendant's promise that the ASC Warranty would cover the source of the noise.

23. During this time, Mr. Jackson also discovered a large hole in the front driver's-side floorboard that reaches deep into the vehicle's frame. The defendant had intentionally concealed the hole by shoving a thick piece of cloth into it and using a strong adhesive to attach the cloth to the driver's side floor mat. Mr. Jackson first noticed the hole after the adhesive had worn out and the floor mat had detached from the cloth.

24. In or about December 2020, Mr. Jackson called and confronted the defendant about ASC denying his claim. Instead of offering to fix the defect under the defendant's express warranty, the defendant's representative told Mr. Jackson to call ASC representative John Bradshaw, who could allegedly resolve the issue in Mr. Jackson's favor. In or about early January 2020, Mr. Jackson contacted Mr. Bradshaw. Mr. Bradshaw told Mr. Jackson that before ASC would reconsider Mr. Jackson's claim, Mr. Jackson should continue trying to have the engine replaced under the Nissan warranty. Mr. Bradshaw asked Hall Nissan to reconsider its decision declining to cover the engine under the Nissan warranty, but Hall Nissan again refused. In or about February 2020, Mr. Bradshaw told Mr. Jackson to get a second opinion about the cause of the engine failure from a different Nissan dealership.

25. On or about February 17, 2020, Mr. Jackson took the vehicle to Banister Nissan of Chesapeake for a second opinion. There, he was shocked to learn that, in May 2019, the defendant had taken the vehicle to Banister Nissan to diagnose a knocking noise coming from the engine and that a Bannister technician had told the defendant that the vehicle's engine needed to be replaced. Instead of replacing the engine, the defendant paid the diagnostic fee, returned the vehicle to its lot, and advertised it for sale. *See* Pl.'s Exhibit A.

26. After learning that the defendant had known about the engine defect before selling the vehicle to him and had kept that information from him, Mr. Jackson returned to the defendant's lot and confronted Mr. Korich about the defendant's fraud. Mr. Korich denied that he knew about the defective engine when he helped sell the vehicle to Mr. Jackson, but he could not speak for anyone else at the dealership. He told Mr. Jackson not to believe Bannister Nissan, which Mr. Korich described as "a bunch of thieves and pirates." Mr. Jackson provided his number and asked that either the defendant's owner or its counsel contact him within 48 hours to settle the issue or he would consider legal action. No one contacted Mr. Jackson.

27. On or about March 23, 2020, Mr. Jackson, through counsel, submitted a written demand that the defendant take the vehicle back and pay Mr. Jackson for his damages. The defendant never responded to the demand.

28. Upon information and belief, the defendant has a pattern and practice of committing fraud when selling its vehicles. In the last six years, several of the defendants' fraud victims have filed complaints against it with the Chesapeake Police Department.

29. After he discovered that the defendant had misrepresented the vehicle's condition, had concealed that the vehicle needed a new engine and that it had a hole in the floorboard, had misrepresented the vehicle's mileage, and after the defendant refused to repurchase the vehicle and pay his damages, Mr. Jackson sought to determine the actual value of the vehicle on the date of sale had he known the truth about it. To that end, he ordered a vehicle appraisal. The appraiser confirmed Hall Nissan and Bannister Nissan's conclusion that the vehicle's engine needed to be replaced, and he confirmed Mr. Jackson's observation of the large, previously concealed hole in the floorboard. The appraiser determined that, given those defects, the vehicle's value at the time of sale was limited to salvage or junk value.

30. A Virginia DMV title-history search of the vehicle was also performed. It revealed that, on August 28, 2015, the vehicle's first owner, Nissan Infiniti LT (believed to be a leasing company), was issued a Massachusetts title listing nine miles on the vehicle's odometer. *See* **Pl.'s Exhibit G,** Massachusetts Title. The vehicle was sold three years later, on December 21, 2018, to Sheehy Nissan of Manassas, listing 54,759 miles on the odometer. *Id.* Then, on February 14, 2019, Sheehy Nissan sold the vehicle to the defendant with the same odometer reading—54,759 miles. *Id*. The defendant sold the vehicle to Mr. Jackson almost five months later, on July 8, 2019, claiming that the odometer reading of 54,759 was the actual mileage, *see* Pl.'s Exhibit C, even though that was the same odometer reading from seven months earlier, when the vehicle was sold to Sheehy Nissan, and despite the defendant having documents in its records showing that the odometer certification it provided to Mr. Jackson was wrong. *See, e.g.*, Pl.'s Exhibit A.

31. Due to the defective engine, the hole in the floorboard, and the defendant's false odometer certification, the vehicle was worth significantly less than what Mr. Jackson agreed to buy it for at the time of purchase.

**C. The defendant's fraud includes odometer fraud.**

32. The defendant intentionally misrepresented the vehicle's mileage to be 54,759 at the time of sale to Mr. Jackson despite knowing or having records in its possession that the vehicle had more miles on it than that.

33. The February 28, 2019 Virginia State Police safety inspection, which the defendant requested National Tire and Battery to perform on the vehicle, recorded an odometer reading of 54,772 miles.

34. The May 8, 2019 service invoice that the defendant received from Banister Nissan lists an odometer reading of 55,014. *See* Pl.'s Exhibit A.

35. The defendant also knew that the vehicle had been driven by employees or potential customers in the five months it owned the vehicle before selling it to Mr. Jackson.

36. On the July 8, 2019 Odometer Disclosure Statement that the defendant provided to Mr. Jackson, the defendant certified that, to the best of its knowledge, the odometer reading of 54,759 was the actual mileage of the vehicle at the time of sale. *See* Pl.'s Exhibit C. The defendant "ma[d]e this certification and affirmation under penalty of perjury" and "underst[oo]d that knowingly making a false statement or representation on this form is a criminal violation." *Id.*

37. Re-Assignment Box 2 on Form VAD 20 provides, in part, "Failure to complete or providing a false statement may result in fines or imprisonment."

38. At the time of the vehicle's sale to Mr. Jackson, the defendant had in its possession a report summarizing the Virginia State Police safety inspection and the Banister Nissan Service Invoice, both of which showed that the vehicle's mileage was more than what the defendant certified to in the Odometer Disclosure Statement. Those documents are evidence of the defendant's misrepresentation and fraud, and they are evidence that the defendant violated the Federal Odometer Act.

39. The defendant does not know what the actual mileage of the vehicle was when it sold the vehicle to Mr. Jackson, but it knew that the vehicle had more than 54,759 miles on it at that time.

40. This odometer discrepancy could have been caused by the defendant tampering with the vehicle's odometer, by the defendant adding miles to the vehicle and then rolling those miles back, by the odometer's malfunction and counting in reverse, by the defendant altering the odometer during repairs, or by the defendant breaking and replacing the odometer with the incorrect mileage.

41. After the defendant titled the vehicle in its name, after the defendant allowed an undetermined number of people to drive the vehicle, after the defendant became aware that the actual mileage on the vehicle was more than 54,759 miles, after the defendant became aware that the vehicle's engine needed to be replaced, and after the defendant concealed the hole in the floorboard, the defendant put the vehicle on its car lot and advertised it for sale, describing it to be in very good condition and listing its mileage as 54,759 miles.

42. To induce Mr. Jackson to purchase the vehicle, the defendant misrepresented it to be in very good or excellent condition, certified that the odometer reading of 54,759 miles was the actual mileage when it knew that was wrong, concealed the engine and floorboard defects, and misrepresented that defects stemming from the noise would be covered by the ASC Warranty. The defendant knew that a truthful description of the vehicle's condition, its odometer reading, and the ASC Warranty's lack of coverage would cause Mr. Jackson to refuse to buy the vehicle.

43. At the time Mr. Jackson took delivery of and accepted the vehicle, he was not aware of the engine defect, the repair history, the odometer discrepancy, or the hole in the floorboard. He would not have purchased the vehicle had he known the truth about those things and about the ASC Warranty's policy excluding coverage of any pre-existing mechanical problems.

44. Because the defendant provided Mr. Jackson with a false odometer disclosure, Mr. Jackson does not know the vehicle's current actual mileage and must advise any potential purchaser that the current mileage is unknown, resulting in a diminished vehicle price.

45. At this time, the vehicle is in the same condition as it was when delivered to Mr. Jackson, excluding any reasonable wear and tear, and due to the defective engine, Mr. Jackson has driven it a limited amount. The vehicle is not being driven now.

46. Due to the defective engine, the vehicle was not merchantable at the time of sale.

47. The defendant's misrepresentations, silence, concealment, or omissions were intentional and material, were intended to mislead, and were intended to induce Mr. Jackson or people like him to purchase the vehicle. The defendant's conduct was unconscionable, constituted actual malice or a reckless and conscious disregard of Mr. Jackson's rights, and therefore constituted actual fraud. At the very least, the defendant's conduct was negligent and therefore constituted constructive fraud.

48. The actions and statements of the defendant's staff and management involved in the sale were within the scope of their actual or apparent authority as agents, officers, and employees of the defendant. The defendant, in turn, ratified the sale through the actions it took after learning about the vehicle's defects and about its staff and management's false statements.

49. The defendant benefitted from Mr. Jackson's reliance on its misrepresentations and omissions by causing him to agree to the sale offer and then by unfairly profiting from the sale.

50. As a direct and proximate result of the defendant's acts, omissions, and false promises, Mr. Jackson has suffered damages past, present, and future, including, but not limited to, losing the benefit of the bargain; paying an excessive price for the vehicle; incurring excessive finance charges; suffering loss of use; experiencing inconvenience, embarrassment, and aggravation; and incurring costs and attorney's fees to obtain relief from the defendant's wrongful acts and omissions.

## COUNT I
### Violation of the Motor Vehicle Information and Cost Savings Act ("Federal Odometer Act")

51. Mr. Jackson incorporates the allegations in paragraphs 1–50 as if alleged herein.

52. Under the Federal Odometer Act, 49 U.S.C. § 32705, and its enforcement regulations in 49 C.F.R. § 580.1 *et seq.*, each purchaser and each seller of the vehicle was required

to certify an accurate and complete odometer disclosure for the vehicle each time it was sold. The defendant violated the Federal Odometer Act by submitting a false odometer disclosure statement to a transferee. *See* 49 U.S.C. § 32705(a); 49 C.F.R. § 580.4.

53. The defendant violated the Federal Odometer Act with the intent to defraud.

## COUNT II
### Actual and Constructive Fraud and Fraudulent Inducement

54. Mr. Jackson incorporates the allegations in paragraphs 1–53 as if alleged herein.

55. The defendant intentionally misrepresented the vehicle to Mr. Jackson in several ways, including: (1) that the vehicle was in very good or excellent condition; (2) that the vehicle's clicking or knocking noise was "no big deal" and was likely caused by the starter; (3) that the source of the noise would be covered under the ASC Warranty; and (4) that the vehicle's odometer reading at the time of sale was 54,759 miles. The defendant deliberately concealed that the vehicle's engine had recently been diagnosed as defective and needed to be replaced and that the vehicle had a large hole in the front driver's-side floorboard. These were material facts and omissions that Mr. Jackson relied on in deciding to purchase the vehicle and have caused his actual damages. Thus, the defendant actually defrauded Mr. Jackson and fraudulently induced him to purchase the vehicle to his detriment.

56. Alternatively, the defendant unintentionally misrepresented those material acts and omissions that Mr. Jackson relied on in deciding to purchase the vehicle to his detriment. The defendant's conduct thus constitutes constructive fraud.

### Request for Punitive Damages for Fraud

57. The defendant's actions show willful and malicious conduct in conscious disregard to Mr. Jackson's rights sufficient to justify an award of punitive damages.

## COUNT III
## Violations of the Virginia Consumer Protection Act

58. Mr. Jackson incorporates the allegations of paragraphs 1–57 as if alleged herein.

59. As defined under the Virginia Consumer Protection Act in Virginia Code § 59.1-198, the defendant's sale of the vehicle to Mr. Jackson was a "consumer transaction," the vehicle constitutes "goods," the defendant is a "supplier," and Mr. Jackson is a "person."

60. In the course of the transactions involving the vehicle, the defendant engaged in the following unfair and/or deceptive practices in violation of Virginia Code § 59.1-200A:

    a. The defendant misrepresented the material fact that the clicking or knocking noise in the vehicle's engine was "no big deal" and was likely caused by the starter. The defendant deliberately concealed that the vehicle had been diagnosed as needing a new engine and that there was a large hole in the floorboard. The defendant also made the false promise that the noise's source would be covered under the ASC Warranty if Mr. Jackson purchased that along with the vehicle. And the defendant misrepresented the vehicle as in very good or excellent condition. These misrepresentation and omissions were made deliberately and in violation of Virginia Code §§ 59.1-200A(6) and (14).

    b. The defendant misrepresented the material fact that the vehicle had been driven only 54,759 miles on July 8, 2019, despite having in its possession service records and a Virginia State Police Safety Inspection Certification noting the mileage to be higher, in violation of Virginia Code §§ 59.1-200A(5) and (14).

    c. The defendant offered for sale a used motor vehicle that was defective, blemished, deteriorated, or reconditioned, or that is a "second," irregular, imperfect, or "not first class," without clearly and unequivocally indicating in the offer for sale that the vehicle is a used motor vehicle, defective, blemished, deteriorated, reconditioned, or is a "second," irregular, imperfect, or "not first class," in violation of Virginia Code § 59.1-200A(7)

    d. The defendant violated Virginia Code § 59.1-200A(14)'s prohibition against using any deception, fraud, false pretense, false promise, or misrepresentation by intentionally misrepresenting the vehicle's condition, mileage, and potential warranty coverage.

61. On information and belief, the defendant intended that Mr. Jackson rely upon the above-described misrepresentations and omissions, and he did so rely.

62. The defendant committed the above-described actions willfully and thus violated Virginia Code §§ 59.1-200A(5), (6), (7), and (14), which entitle Mr. Jackson to seek recovery of three times the actual damages, plus attorney fees and court costs, under Virginia Code § 59.1-204.

## COUNT IV
### Breach of Express and Implied Warranties and Violation of the Magnuson-Moss Warranty Act

63. Mr. Jackson incorporates by reference all facts and allegations set forth in paragraphs 1–62 of this complaint.

64. Mr. Jackson is a "consumer" as defined in the Magnuson-Moss Warranty Act. 15 U.S.C. § 2301(3). The defendant fits the definition of "supplier" and "warrantor" as defined in §§ 2301(4) and (5). And the vehicle is a "consumer product" as defined in § 2301(1).

65. The vehicle was manufactured after July 4, 1975, and Mr. Jackson received an express limited warranty and an implied warranty of merchantability as part of the purchase—warranties that meet the definitions of "written warranty" and "implied warranty," respectively, under 15 U.S.C. § 2301(6) and (7).

66. The defendant breached its express warranty by refusing to repair the vehicle. And the defendant breached its implied warranty of merchantability because the vehicle, thanks to an engine that was defective at the time of sale, was not fit for the ordinary purpose for which it was used. The defendant thus violated the Magnuson-Moss Warranty Act. 15 U.S.C. §§ 2308, 2310(d).

67. As a proximate result of these violations and warranty breaches, Mr. Jackson has suffered damages, and the defendant is responsible. 15 U.S.C. §§ 2304(a), 2310(d).

## PRAYER FOR RELIEF

WHEREFORE, Mr. Jackson respectfully *prays* that this Court award the following damages, jointly and severally:

1. Award actual damages under fraud, the Virginia Consumer Protection Act, and the Magnuson-Moss Warranty Act;

2. Award three times the actual damages or $1,000, whichever is greater, for each willful violation of the Virginia Consumer Protection Act under Virginia Code § 59.1-204;

3. Award statutory damages of $10,000 or treble actual damages, whichever is greater, under the Federal Odometer Act, 49 U.S.C. § 32710(a);

4. Award Mr. Jackson's costs, pre-judgment interest, and reasonable attorney's fees consistent with the Federal Odometer Act and the Magnuson-Moss Warranty Act;

5. Award Mr. Jackson's costs, pre-judgment interest, and reasonable attorney's fees consistent with the fraud claims and under the Virginia Consumer Protection Act;

6. Award Mr. Jackson punitive damages against the defendant in the amount of $350,000; and

7. Award such other relief as this Court deems appropriate against the defendant.

**TRIAL BY JURY IS DEMANDED**

        **Respectfully submitted,**

        **WILLIAM BUCHANAN JACKSON,**

        */s/*    John Cole Gayle, Jr.
        John Cole Gayle, Jr., Esquire
        VSB No. 18833
        The Consumer Law Group, P.C.
        Counsel for Plaintiff
        1508 Willow Lawn Drive, Suite 220
        Richmond, Virginia 23230
        Telephone: 804 282-7900
        Facsimile: 804 673-0316